UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TINA M. WAMHOFF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06CV808 TIA |
| ) | |
| MICHAEL J. ASTRUE,[1] COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. | |

## **MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §§ 405(g) judicial review of the denial of Plaintiff's application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## **Procedural History**

On February 23, 2004, Plaintiff filed an application for a Period of Disability and Disability Insurance Benefits, alleging a birth date in April, 1969 and an onset date of October 13, 2003. (Tr. 136-138) Plaintiff claimed disability due to back problems. (Tr. 173) The application was denied, and Plaintiff requested a hearing. (Tr. 46-51) On May 10, 2005, Plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 270-309) In a decision dated September 2, 2005, the ALJ determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 13-24) On March 24, 2006, the Appeals Council denied Plaintiff's request for review. (Tr. 3-6)

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne Barnhart, as the proper party defendant. See 20 C.F.R. § 422.210(d).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

During the hearing dated May 10, 2005, Plaintiff testified before the ALJ and was represented by counsel. Plaintiff lived with her parents in their home in House Springs, Missouri. She had been divorced for nine years. She had a high school education and some vocational training at the National Academy of Beauty Arts. She started obtaining her beautician's license in September 2003 and planned to graduate a few days after the hearing. Plaintiff testified that she attended classes five hours a day, four days a week. Her intent was to be a beautician. (Tr. 274-275)

Plaintiff had prior work experience as a machine operator and a packer. Plaintiff testified that the heaviest weight she lifted in these jobs was about 30 or 40 pounds. They both required standing all day except at break time. Plaintiff currently took care of her 13-year-old daughter and had a pending worker's compensation claim. Plaintiff attended vocational rehabilitation in 2004. According to Plaintiff, the vocational rehabilitation facility unsuccessfully tried to find her a part-time, sitting job. Plaintiff applied for unemployment in 2004 as well but was turned down. The record demonstrated that Plaintiff had earnings in 2003 and 2004 but had no earnings in the fourth quarter of 2002. Plaintiff explained that she was on sick leave through her union. Further, Plaintiff testified that the earnings she received in 2004 was paid vacation. However, she stated that she did not work since the date she allegedly became disabled in October 2003. (Tr. 275-284)

Plaintiff testified that she stopped working due to problems with her back and knees. She missed some work in 2003 for a problem with her shoulder rotator cuff, for which she received physical therapy. After she returned to work, she experienced spasms in her back and was unable to perform her job because it required bending. According to Plaintiff, a doctor told her she could no

longer do that job. She started beauty school while she still worked at the factory because she wanted a change in jobs. Plaintiff stated that she could no longer perform the factory job because of her back, shoulder, and knees. She specified that she had trouble lifting the 30 to 40 pounds of pans every day. (Tr. 284-287)

Plaintiff further testified that raising her arms to shoulder level or above her head would hurt if she had to do it 40 hours a week. While she had more trouble raising her left arm, she stated that she could use her left arm and hand at the beauty school because she did not have to raise it high. She did testify that her shoulder hurt sometimes at the end of the day. Plaintiff stated that in October 2003, she was having spasms. After an MRI, the doctor showed her what the problem was. She had worked the same job for 14 years but could no longer perform. Plaintiff was terminated after taking leave for a year. However, her condition did not improve after leaving work. (Tr. 287-289)

Plaintiff described her biggest physical problem as the pain in her lower back, around the tail bone. The pain did not radiate, but it was constant. The pain worsened when sitting or standing for a long time. On a scale from 1 to 10, Plaintiff rated her pain as a 7. On bad days, it was an 8 or 9. Plaintiff testified that she experienced the extreme pain about once a day when she stands for a long period of time. She opined that she could stand for about 30 minutes before the pain became an 8 or 9. With regard to her ability to attend beauty school, Plaintiff stated that she did not stand the whole time. She was able to take breaks and sit between clients. Plaintiff testified that she usually took only one client for about a half hour at night and was able to sit the rest of the time. Further, she stated that the school, not her, received money from the clients. She sometimes received a dollar or two in tip money. Plaintiff stated that she could stand in one place for 30 or 40 minuted before needing relief from the pain. Plaintiff needed to sit and relax for 30 to 45 minutes before she felt good

3

enough to do someone else's hair. She rated the pain as a 7. Plaintiff was able to concentrate and focus her attention on looking over paperwork or reading a book after working on a client. However, Plaintiff stated that she could not work 8 hours a day sitting and standing back and forth. She testified that she could only work 5 hours in a workday. Although Plaintiff was able to drive home after working 5 hours at the beauty school, she stated that she was hurting. (Tr. 289-296)

When Plaintiff returned home, she took her medicine and went to bed. She took pain medicine twice a day. She stated that the medication made her tired. Plaintiff took it in the morning then took a nap for an hour or two before attending school. On a typical day, Plaintiff woke up with her daughter at 6:00 a.m.; took her medication and ate something; went back to sleep around 8:00 or 9:00 a.m.; and then woke up around 11:00 a.m. or 12:00 p.m. Plaintiff further testified that she had problems sleeping. She felt tired when she woke up in the morning, so she slept for three hours until 11:00 or 11:30 a.m. She left for beauty school around 3:00 p.m. and returned home around 10:00 p.m., feeling worn out and hurting. After graduation, Plaintiff planned to look for a part-time job. She felt that she could not work an 8-hour day. However, she was not certain because she had not been in that predicament. (Tr. 296-300)

With regard to her daughter, Plaintiff stated that she took her daughter to basketball and watched her. Plaintiff sometimes went to church. Plaintiff took Cycotrophic for spasms, another medication for pain, and Prozac for depression. Plaintiff testified that she had been taking Prozac for nine years. She stated her depression was better than before she started taking medication. She stated that the medication kept her emotions in the middle where she could think. Plaintiff stated that she still experienced symptoms of depression, specifically fatigue. She received counseling for 6 months in 1997 or 1998. Plaintiff saw a psychiatrist twice a week during that time. She had never

4

been hospitalized for a mental impairment. Further, Plaintiff testified that her physician, Dr. Lynch, was a primary doctor, not a psychologist or psychiatrist. Dr. Lynch was the doctor who diagnosed Plaintiff with depression. (Tr. 300-304)

With regard to Dr. Lynch, his report indicated that Plaintiff reported the ability to work part time but not full time. Plaintiff explained that her back hurt all the time. Plaintiff also reported trying aqua classes at the YMCA, but she quit because they did not help. Dr. Lynch's report also indicated memory impairment. Plaintiff stated that she had difficulty remembering things, both in school and in life. Although the medication helped with her mental impairments, Plaintiff testified that she did not want to be on the medication the rest of her life. At the close of the hearing, the ALJ held the record open for further information regarding Plaintiff's mental impairment and the monies Plaintiff received through 2004. (Tr. 304-309)

**Medical Evidence**

In February 1997, Plaintiff underwent an Initial Mental Health Treatment Plan at Unity Health Network/Select Care. She was diagnosed with Adjustment Disorder mixed with a Global Assessment Functioning (GAF) of 60-61. The treatment plan included individual psychotherapy, behavior management skills, and parenting skills training. The orders indicated visits 2 times a month over a 6 month period. (Tr. 199-201) Progress notes indicate that Plaintiff missed several appointments. (Tr. 194-198)

On January 3, 2003, an MRI of Plaintiff's lumbar spine revealed L5-S1 degeneration with no significant thecal sac or nerve root compromise noted. (Tr. 263) July 2003 treatment notes from Dr. Edward Lynch revealed low back and mid-thoracic back pain. Plaintiff complained of middle and low back pain that had bothered her off and on over the past 6 months. Examination revealed mild to

moderate L5-S tenderness and mid-thoracic back tenderness. Straight leg raising was negative at 90º bilaterally. She was very stiff all over, with flexion to 50º and extension to 10º. Dr. Lynch advised Plaintiff to stretch, perform appropriate exercise, apply heat, and attend 6 physical therapy visits. (Tr. 212)

Dr. Lynch examined Plaintiff again on October 21, 2003. She complained that her back was not any better and that she experienced low back spasms and tingling in her right lateral thigh. Physical examination revealed moderate to marked tenderness in the lower back, along with bilateral knee pain. Straight leg raising was positive at 20º on the right and 30º on the left. Dr. Lynch prescribed Celebrex, Prednisone, and Cyclobenzaprine and noted that Plaintiff may need a rheumatoid consultation. (Tr. 210)

On November 6, 2003, Plaintiff continued to complain of lower back pain and knee pain. She reported that physical therapy did not help, although her medications helped some. Upon examination, Dr. Lynch noted back tenderness in the S1-3 area bilaterally. Straight leg raising was positive at 70º on the right and 80º on the left. He noted that she was very slow getting up from the chair and table and that she could not lift 10 pounds. Dr. Lynch assessed chronic low back pain. He prescribed Mobic, advised Plaintiff to continue the same medications, and recommended that she see pain management. (Tr. 208-209)

Dr. John Graham of the Pain Treatment Center examined Plaintiff on November 18, 2003. After reviewing her records, history and physical examination, Dr. Graham felt Plaintiff would benefit from an epidural steroid injection trial. Dr. Graham noted that Plaintiff received an injection that day without complication. He advised her to continue the Mobic, prescribed Remeron as a sleep aid, and recommended that Plaintiff would benefit from an anti-depressant. (Tr. 245) Plaintiff returned to Dr.

Graham on December 2, 2003. She reported no change following the epidural injection. Dr. Graham noted that Plaintiff had some degenerative change at L5-S1 but no nerve root impingement and no leg symptoms. He recommended holding on any further injections, as Plaintiff did not benefit from the first one. Plaintiff reported that her only medication was an anti-depressant, a generic of either Prozac or Zoloft. Dr. Graham noted that Plaintiff should continue taking the anti-depressant. He also prescribed Voltaren, an anti-inflammatory, and continued physical therapy. Dr. Graham stated, "I am not doubting that Ms. Wamhoff has some low back pain, but her objective findings are negligible and her MRI shows some degenerative changes and this is something that Ms. Wamhoff will need to learn how to function with and the best approach in my opinion would be an exercise program and some anti-inflammatories." (Tr. 241-243)

On December 16, 2003, Plaintiff reported doing better on the Voltaren, which helped considerably with the pain. She reported attending physical therapy only once a week instead of the prescribed three times a week. Dr. Graham noted that the best approach to feeling better would be to participate in a regular course of therapy. Plaintiff stated that she wanted to try to return to work, which Dr. Graham opined would be fine. He noted no objective medical indication that would prevent her from working. Further, Dr. Graham acknowledged her subjective complaints of pain with some arthritic change in her back which would cause some pain, but he also noted it should not significantly limit her ability to function in a normal manner. (Tr. 238)

On December 30, 2003, Dr. Graham noted Plaintiff's previous MRI. While Plaintiff thought the problem could be in her hip, Dr. Graham found nothing upon examination that would indicated any hip involvement or abnormality in the SI joint. He noted that SI joint problems were typically related to arthritic changes in elderly patients. He opined that Plaintiff's back pain was due to the

7

degenerative change at L5-S1. Dr. Graham recommended treating Plaintiff's back problems conservatively with anti-inflammatories and a regular exercise program. He advised Plaintiff that she could find a surgeon to surgically fuse her lower lumbar spine but that it would unlikely make a significant impact on her pain. He recommended that Plaintiff be faithful to her home exercise program and use 1 to 2 Aleve tablets every 12 hours as needed. (Tr. 236-237)

Plaintiff returned to Dr. Lynch on January 6, 2004, reporting severe low back spasms to the point that she could not sit or stand for more than 15 to 20 minutes. She also reported that the pain radiated into the right leg with numbness as well. Plaintiff stated that the epidural did not help, nor did the Aleve work. Dr. Lynch noted moderate tenderness in Plaintiff's back at L4-S3 bilaterally. Flexion was limited to 20°° and extension was 0, with normal rotation. Dr. Lynch's impression was lower back pain. (Tr. 207)

On January 16, 2004, Plaintiff underwent an MRI of her lumbosacral spine, which revealed right posterior-lateral disk protrusion predominantly into the inferior recess but probably also compromising the right S1 root in the lateral recess. The physician asked whether Plaintiff had right S1 radiculopathy clinically. (Tr. 261-262) Upon review of the MRI, Dr. Michael Polinsky noted fairly advanced degenerative changes at the L5-S1 level with adjacent signal change in the end plates and vertebral bodies. He also noted some disc protruding at this level. Dr. Polinsky assessed mechanical low back pain which left Plaintiff feeling fairly incapacitated. He recommended finishing her course of physical therapy, becoming rigorous with a home exercise program, and losing weight. He also discussed the utility of electrical stimulation. Dr. Polinsky recommended that Plaintiff take a muscle relaxer such as Flexeril in the evenings and continue on non-steroidal anti-inflammatory medication. Dr. Polinsky noted that Plaintiff had been placed off work until March 22, 2004. He opined that it

8

was unlikely that she would be capable of returning to her previous line of work and that her long term capacities will be limited by her low back condition. He discussed surgical options, noting that they are large operations which commonly provide patients with very little benefit. (Tr. 257-260)

A Physical Therapy Discharge Report dated January 30, 2004 noted that Plaintiff had six visits since her initial evaluation on December 5, 2003. Plaintiff reported having good days and bad days, with spasms in her low back when the medication began to wear off. Plaintiff also stated that she had difficulty doing exercises, secondary to pain. However, she tried to do her home exercise program. She also reported having trouble bending and straightening her back. The physical therapist, Irene Luc, noted that Plaintiff had plateaued in her physical therapy. Her biggest limitation was low back pain that was not managed even with pain medication. Ms. Luc instructed Plaintiff to continue her home exercise program as tolerated. (Tr. 215-216)

On March 15, 2004, Dr. Lynch re-evaluated Plaintiff, who reported no improvement despite physical therapy and medication. Plaintiff also reported that a neurosurgeon did not recommend surgery but did recommend a change in jobs. Plaintiff stated that she was doing home exercises and could walk 15 minutes without her back hurting. Dr. Lynch observed moderate tenderness bilaterally over the paralumbar and lumbar area at L4-S2. Straight leg raising was positive at 60º on the left and 70º on the right. Rotation and side bending were normal with flexion to 45º. Dr. Lynch assessed chronic low back pain. He recommended that Plaintiff consider a new line of work and tentatively return to work in June 2004. (Tr. 206)

Joseph Hanaway, M.D., examined Plaintiff on September 2, 2004. Plaintiff reported chronic low back pain that was constant but variable depending upon her activities. She also had some right shoulder pain and knee complaints. Dr. Hanaway reviewed the MRI's taken in January 2003 and

9

January 2004, noting that the most recent MRI showed a flattened L5-S1 diffuse bulging into both foramina. The other disks looked unremarkable. Plaintiff have a history of a gradual onset of progressive low back pain. Her mental status otherwise appeared to be normal. Low back exam revealed a flattened low back. There was moderate spasm on the right side greater than the left in the lower lumbar region at L4-5 down to the sacrum. Her complaints of back pain limited bending forward to 50 degrees, and bending back and to the side to 10 degrees. Straight leg raising was negative for complaints at 90 degrees. Dr. Hanaway assessed a lumbar disk at L5-S1 based on MRIs taken in 2003 and 2004. Plaintiff also had an aggravated underlying problem of work. They discussed physical therapy, shots, and surgery, noting that disk replacement may be in Plaintiff's future because she has a single level disk problem. Plaintiff had no complaints regarding her right shoulder at that time. Dr. Hanaway opined that Plaintiff was temporarily and totally disabled and could not return to her old job without increasing her risk of low back pain. He also recommended an epidural steroid. (Tr. 204-205)

On April 22, 2005, Dr. Lynch examined Plaintiff for complaints of continued low back pain. He assessed right cervical adenopathy and chronic low back pain. He advised Plaintiff to continue the same medications, work half-time if able, and follow-up in 3 to 6 months. Dr. Lynch also noted that Plaintiff's mood was the same, although better some days. She was attending school but did not think she could work a full 8-hour job. Part-time was okay. Plaintiff still stretched and attended a YMCA class twice a week. Her memory impairment had been worse lately. (Tr. 202-203)

On May 11, 2005, Dr. Lynch drafted a note on his prescription pad, indicating that depression and chronic pain interfered with full time work for Plaintiff. (Tr. 190) On September 12, 2005, Dr. Hanaway acknowledged a previous report from Dr. Reinsel and noted some conflicting statements.

10

While both doctors agreed that Plaintiff had degenerative disc disease and degenerative spine disease, Dr. Hanaway believed that Plaintiff's low back pain was related to her work with an aggravated underlying condition. He noted that the other doctors also agreed that her low back problem was related to her work activities. Dr. Hanaway observed that Plaintiff continued to have symptoms and had to work at a sedentary light duty job in order not to aggravate her low back pain. He stated, "I do not think there is any question that the patient's occupation is what caused her low back pain that she has now with an underlying degenerative spine disease that was aggravated. The patient has a herniated L5-S1 disc as seen on two MRI scans … and continues to have midline low back pain that is aggravated by any heavy activities." Dr. Hanaway concluded that Plaintiff's back problems, which began two years ago, would fit the criteria for permanency. However, he opined that whether it was permanent total was debatable, as Plaintiff was able to do sedentary work. (Tr. 265)

## **The ALJ's Determination**

In a decision dated September 2, 2005, the ALJ determined that Plaintiff met the disability insured status requirements of the Act on the alleged onset date and continued to do so through the date of the Decision. Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, October 13, 2003. The medical evidence established that Plaintiff had degenerative disc disease of the lumbosacral spine and an affective disorder, which combination of impairments was severe within the meaning of the regulations. Plaintiff did not have an impairment or combination of there of listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4. The ALJ further found that Plaintiff's allegations regarding the degree of her symptoms and limitations were not credible. The ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform a wide range of light exertional work. Such work required lifting a maximum of 20 pounds;

frequently lifting 10 pounds; and standing/walking for 6 out of 8 hours. The ALJ determined that Plaintiff could perform at least unskilled work activity throughout an 8-hour workday and otherwise retained no significant limitation on ability to understand, carry out, and remember instructions; use simple judgment; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. (Tr. 14, 24)

The ALJ further found that Plaintiff was unable to perform her past relevant work. She was a younger individual with a high school and beautician education. Plaintiff had a semi-skilled work background but had no transferable skills. The ALJ found that Plaintiff was not disabled, as there were a significant number of jobs within the regional and national economies. Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the SSA at any time from October 13, 2003 through the date of the decision. (Tr. 24)

Specifically, the ALJ assessed Plaintiff's testimony regarding her activities, her pain, and her mental impairment. (Tr. 13-16) The ALJ further evaluated the medical evidence submitted by the Plaintiff regarding her alleged mental impairments. The ALJ also noted the medical records regarding Plaintiff's low back pain submitted by Drs. Lynch, Graham, Polinsky, and Hanaway. (Tr. 16-19) The ALJ then found that Plaintiff's subjective testimony regarding her pain and functional limitations were inconsistent with objective evidence. (Tr. 20-22) The ALJ determined that Plaintiff retained some pain and limitation resulting from her combined impairments; however, evidence in the record did not support the degrees of symptoms and limitations as alleged by Plaintiff. Thus, the ALJ concluded that Plaintiff retained the RFC to perform a wide range of light exertional work. While she could not perform her past relevant work, the ALJ relied on the medical-vocational guidelines to determine that there were a significant number of jobs in the regional and national economy that Plaintiff could

perform. Thus, the ALJ concluded that Plaitniff was not disabled within the meaning of the SSA.

**Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial

evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to property consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective

---

[2] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

14

complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

**Discussion**

Plaintiff argues that the ALJ failed to properly consider Plaintiff's RFC under the standards contained in Singh and Lauer. Further, Plaintiff asserts that the ALJ failed to properly consider Plaintiff's subjective complaints under Polaski. Finally, Plaintiff contends that the ALJ's decision is not supported by substantial evidence because it lacks necessary vocational expert testimony, as Plaintiff had significant nonexertional impairments. The Defendant argues that the ALJ properly determined Plaintiff's RFC. Further, the Defendant maintains that the ALJ properly considered Plaintiff's credibility. Finally, the Defendant contends that the ALJ properly determined that Plaintiff could perform other work by relying on the guidelines.

Contrary to the Defendant's assertions, under Eighth Circuit law, where a claimant "suffers from a severe mental impairment, the [Commissioner] must use vocational expert testimony . . . to meet [her] burden of showing the existence of jobs in the national economy that the claimant is capable of performing." Wheeler v. Sullivan, 888 F.2d 1233, 1238 (8th Cir. 1989); see also Vincent v. Apfel, 264 F.3d 767, 769-770 (8th Cir. 2001) (the ALJ should have utilized a VE to determine how plaintiff's mental impairment affected his RFC in light of the ALJ's finding that plaintiff's impairment was severe); Holley v. Massanari, 253 F.3d 1088, 1093 (8th Cir. 2001) ("when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a

15

determination of no disability"); Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (although plaintiff's borderline intellectual functioning did not meet a listing, plaintiff was entitled to have a VE consider this condition along with other impairments to determine how it impacted plaintiff's RFC).

Although the ALJ found that Plaintiff retained no significant limitation of ability to understand, carry out, and remember instructions; use simple judgment; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, the ALJ also considered Plaintiff's mental impairment to be severe. The record demonstrates that Plaintiff received psychiatric treatment in 1997 and that she continued to take anti-depressants and complain to her physicians regarding depression and impaired thinking. In light of this "severe" mental impairment, the ALJ should have consulted a VE to determine whether Plaintiff's nonexertional impairment(s) affected her ability to perform the full range of light jobs. While plaintiff's mental problems may or may not be disabling, they appear to be significant enough to have an impact on her ability to do the full range of work, and these impairments should be addressed by a vocational expert.

Therefore, the undersigned finds that this case should be remanded to the Commissioner for further proceedings to consult a VE to ascertain the effect of plaintiff's mental impairments on her ability to work. Holz v. Apfel, 191 F.3d 945, 947 (8th Cir. 1999). On remand, the ALJ should also consider the most recent report of Dr. Hanaway indicating that Plaintiff had a permanent disability but was capable of sedentary work. Further, to the extent that the ALJ found the reports of the treating physicians vague or ambiguous, the ALJ should contact those doctors for further clarification. The undersigned does not express an opinion on whether or not Plaintiff is disabled or

entitled to benefits. The case should therefore be remanded to the Commissioner for further proceedings consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. A separate Judgment shall accompany this Order.

/s/ Terry I. Adelman<br>UNITED STATES MAGISTRATE JUDGE

Dated this  21st  day of September, 2007.